MARK NORRIS *v.* TIMOTHY SHOWERMAN AND LEWIS S. CHURCH.

In construing an instrument, the whole of it should be considered, and a construction of a detached part, without reference to the rest, is erroneous.

An agreement by a lessee in a memorandum signed by him at the foot of the lease, before it was assigned, constitutes a part of the lease.

Where equities are equal, and neither party has the legal title, or the legal title has been procured with a knowledge of the prior equity, the party who has the prior equity must prevail.

Where water was leased in the following words:  " The right and privilege of drawing from the west side of a race now making by the said party of the first part, in Ypsilanti aforesaid, and leading to his new saw-mill, at any place within sixteen rods from the head-gate of said race, as much water as will run through an aperture of two feet square, under a head of four feet from the top of said aperture," &c., *it was held* the words, " under a head of four feet from the top of said aperture," must be construed as referring to the location of the aperture, and not to the quantity of water leased ; and that the lessee was entitled to as much water as he could take through an aperture two feet square, made in the side of the race, not lower down than four feet below the surface of the water in the race ; and not to as much water as would pass into space, through such an aperture, under a head of four feet above the top of the aperture.

THE bill in this case was filed to obtain an admeasurement of water under the following lease :

 " Article of agreement made and entered into this ninth day of June, in the year of our Lord one thousand eight hundred and thirty-two, between Mark Norris of Ypsilanti, county of Washtenaw and territory of Michigan, of the first part, and Alanson M. Hurd, of Detroit, in the territory aforesaid, of the second part, witnesseth :  That the said party of the first part, for and in consideration of the covenants and agreements hereinafter contained, to be performed and kept by the said party of the second part, doth hereby grant and convey to the said party of the second part, and to his heirs for fifty years, and the privi-

lege of renewing this agreement for fifty years more, at the end of this term, the right and privilege of drawing from the west side of a race, now making by the said party of the first part, in Ypsilanti aforesaid, and leading to his new saw-mill, at any place within sixteen rods from the head-gate of said race, as much water as will run through an aperture of two feet square under a head of four feet from the top of said aperture, for the use of carrying machinery for iron works, provided so much shall be needed by the said party of the second part for such use, and also the right of erecting a bridge across said race and using the same. In consideration whereof, the said party of the second part hereby agrees to pay to the said party of the first part the sum of fifty dollars per year, payable annually on the ninth day of June, for the payment of which sum the said party of the second part hereby binds himself, his heirs, executors and administrators."

"It is hereby further agreed by and between the parties aforesaid, that in case two feet square of water should not be enough for the use of such iron works, as the said party of the second part may hereafter erect near said race, that he shall have as much more as may be necessary for such use by paying therefor, at the same rate as for the two feet square aforesaid. It is further agreed that in case a sufficient quantity of ore cannot conveniently be procured for carrying on said iron works to advantage, that the said two feet square of water may be used for such other machinery as the said party of the second part shall think fit and proper.

In witness whereof the said parties hereunto set their hands and seals the day and year first above written.

In presence of      }          *Mark Norris,* [L. S.]
*E. M. Skinner.*    }          *A. M. Hurd,* [L. S.]

It is further agreed that the water is to be measured at the head-gates.

Witness present,   ⎫       *A. M. Hurd*, [L. S.]
*E. M. Skinner.*   ⎭

The lease, with the memorandum at the foot of it, was recorded June 26th, 1834; and Hurd, May 22d, 1835, assigned one half of the lease to James M. Edwards, Abel Godard, and Allen Stewart, and the other half to Morris Sage. The assignments referred to the lease as recorded; and the bill stated the defendants were, by assignment, the owners of the whole leasehold interest. It also stated that, after the lease was executed, it was agreed between complainant and Hurd the water should be taken from the dam, instead of the race leading to complainant's mill; and that, in consequence of such agreement, the water was taken by a flume from the dam, and the memorandum at the foot of the lease was made and signed by Hurd. That the flume had become old and leaky; that defendants had refused to repair it; that it permitted the water to waste; and that defendants used more water than they were entitled to under the lease, to the great injury of complainant's mill. That complainant notified them he wished to have the water measured, and, in December, 1838, gave them notice he would attend to assist in putting in a head-gate for that purpose, and, defendants refusing to attend, he put in a head-gate with an aperture two feet square in it for the water to pass through from the mill-pond into the flume, which head-gate Showerman soon after removed. That, in May, 1839, defendants still refusing to assist in putting in a head-gate, complainant caused a new head-gate, with an aperture as aforesaid to be fitted in, which Showerman also removed.

The bill prayed the defendants might be required, un-

der the direction of the Court, or some one to be appointed for that purpose, to replace the head-gate so removed by them, and be enjoined from afterwards removing it.

The answer of Showerman admitted the lease and the recording thereof, but denied the memorandum at the foot was a part of it.` Admitted the several assignments of the lease set forth in the bill, and stated the entire leasehold interest was in him,—Church having assigned to him long before the bill was filed. Denied he had drawn more water than he was entitled to under the lease. Stated he had, from time to time, repaired the flume, and prevented, as far as was in his power, the waste of water by leakage. That Hurd had sold his interest in the lease before he made the memorandum ; that Hurd had no authority for making the memorandum at the foot of the lease ; that complainant had frequently requested to have the water measured at the head-gate, but he had always insisted, and still insisted, it should be measured on the wheel, and not at the head-gate. Admitted complainant, in 1838, put in a head-gate with an aperture as stated in the bill, but that there was not a head of four feet over the aperture, and that he, with the assistance of others under his direction, removed the head-gate so put in. Made the like admission with regard to the head-gate put in, in May, 1839. Admitted the memorandum at the foot of the lease was made by Hurd before the lease was assigned by him, but that he had previously sold his interest in the lease, and given the purchasers the entire control of the property.

Many witnesses were examined as to the measurement of water, &c., and the bill was taken as confessed against Church.

*Kingsley & Backus*, for complainant.
*Lane & Miles*, for Showerman.

THE CHANCELLOR. Many witnesses have been examined, and much testimony has been taken in this cause, but it must turn altogether on the construction to be given to the agreement or lease.

Showerman insists he is entitled to as much water as will pass through an aperture two feet square, under a head of four feet above the top of the aperture, and with nothing below the aperture to obstruct the water in passing; —that is, the water, passing through the aperture, must not pass into, or be obstructed by dead water below.

The words of the lease, " as much water as will run through an aperture of two feet square, under a head of four feet from the top of said aperture," it is contended, refer to the quantity of water ,merely, disconnected from the mode of taking it ; and witnesses have been examined to show this is the true construction of the lease. I cannot give such a construction to the instrument. Such could not have been the intention of the parties when the lease was drawn. The testimony of defendant's witnesses clearly shows to my mind the absurdity of the construction contended for. Ailes says he measured the water in the river on the 24th of August preceding his examination, and that it would take about ten-sixteenths of it, nearly two-thirds, to supply the quantity leased, measured as above stated. Braman, who gives the same construction to the lease, says defendant would have water enough, if rightly managed, to drive six or seven run of stone. It is evident, I think, from the lease itself, such a result could not have been intended, or anticipated by the parties, when the lease was executed. The water was leased for the purpose of carrying machinery for iron-works to be erected by the lessee; and it was to be taken from the side of the race leading from the mill-pond to complainant's saw-mill. It was not to be taken directly from the

Norris *v.* Showerman.

pond, as it would, in all probability, have been, if the lessee was to have two-thirds of the whole water power of the river at that point. Besides, it is provided that, if the quantity leased should be insufficient for the use of the iron-works, the lessee should have as much more as might be necessary, paying at the same rate.

The error of the construction contended for, consists in not looking to the whole lease for the intention of the parties, but in selecting out a few words, and giving a construction to them, without reference to the connection in which they stand with other parts of the instrument. By the language of the lease, complainant granted to the lessee "the right and privilege of drawing from the west side of the mill-race, now making by the said party of the first part, in Ypsilanti aforesaid, and leading to his new saw-mill, at any place within sixty rods from the head-gate of said race, as much water as will run through an aperture of two feet square." Suppose the sentence ended here, would there be any doubt the parties meant the lessee should have as much water as would run through an aperture two feet square, made in the side of the race? It seems to me there could be no difference of opinion on this point. But the sentence continues, "under a head of four feet from the top of said aperture, for the purpose of carrying machinery for iron-works." Now, this part of the sentence, when taken in connection with what precedes it, has reference more particularly to the mode of taking the water, than to the quantity to be taken. It refers to the location of the aperture in the side of the race, and limits the distance the top of the aperture may be placed below the surface of the water in the race, to four feet. The lessee is to have as much water as he can take through an aperture, two feet square, made in the side of the race, not lower down than four feet from the surface

of the water in the race.  This is what I understand by
the words, "under a head of four feet from the top of said
aperture," as used in the lease.  It may be said the les-
see, by taking the water in this way, would lose in part
the benefit of the fall, or head.  That is true; but it must
be remembered he would draw a much larger quantity
than he could with the same aperture placed on a level
with the surface of the water in the race.

Other parts of the lease, I think, show pretty conclu-
sively the water is to be taken through an aperture of two
feet square.  Thus, "in case *two feet square of water* should
not be enough;"—"at the same rate as for the *two feet
square aforesaid;*"—"that the said *two feet square of water*
may be used," &c.  The language in each of these cases
refers to the size of the aperture through which the wa-
ter is to be taken; and the lease provides for an increased
quantity, should the water thus taken prove to be insuffi-
cient for the purposes contemplated by the lease.

Much was said, on the argument, about the memoran-
dum made at the foot of the lease by Hurd, the lessee.  I
do not look upon the memorandum as of any importance,
one way or the other, unless it be for the purpose of show-
ing that the parties understood the lease as I understand
it.  By changing the place of taking the water from the
race to the mill-pond, they did not increase or lessen the
quantity to be taken, or change the mode of taking it, ex-
cept as to the place.  Nothing of this kind would be im-
plied, and the memorandum clearly shows nothing of the
kind was intended.

But the memorandum is a part of the lease.  It was
made a part of it before the lease was assigned, which
was on May 22d, 1835.  Hurd had previously to this, it
is true, agreed to assign one half of the lease to Edwards,
Godard, and Stuart, and the other half to Sage; but nei-

ther of these parties had, at that time, a legal interest in the lease itself. They had, at most, but an equitable interest in the lease, which might have been enforced in this Court. Now, complainant had a still prior equity to have the water measured at the headgate, under the parol agreement between him and Hurd, when the place of taking the water was changed from the race to the mill-pond. Both Alanson M. Hurd and Philo C. Hurd testify the measuring of the water at the head-gate was a part of this agreement. Hurd, then, did only what a court of equity would have compelled him to do, when he made and signed the memorandum at the foot of the lease. I am now taking it for granted the memorandum is a material part of the lease. Had the assignees of Hurd taken an assignment of the lease, without the memorandum at the foot of it, but with a knowledge of the agreement between Hurd and complainant, they would have taken it subject to complainant's equity to have the water measured at the head-gate. When equities are equal, and neither party has the legal title, or the legal title has been procured with a knowledge of the prior equity, the one who has the prior equity must prevail. *Grimstone* v. *Carter*, 3 *Paige R.* 436; *Wing* v. *McDowell*, *ante* 175.

When complainant put in the head-gate, in December, 1838, and again in May, 1839, he made the aperture in the gate as far under the water as the defendant's flume would admit. If defendant wished the top of the aperture to be four feet under the water, when at high water mark, he should have lowered his flume for that purpose. He was altogether in the wrong, in removing the head-gates.

Bill dismissed against Church, without costs, and decree entered against Showerman, in accordance with the opinion of the Court.